**EMPLOYERS NATIONAL INSURANCE COMPANY, Plaintiff,**

v.

**GENERAL ACCIDENT INSURANCE COMPANY, Defendant.**

Civ. A. No. H–91–3803.

United States District Court, S.D. Texas, Houston Division.

July 7, 1994.

550

Michael Phillips, Houston, TX, for plaintiff.

George S. McCall, Irving, TX, for defendant.

## OPINION ON FINAL JUDGMENT

HUGHES, District Judge.

### 1. Introduction.

Employers National Insurance Company sued General Accident Insurance Company to recover payments it made in settlement of a bodily injury suit in a state court. Both of them insured Jobs Building Services, Inc., one of the defendants in that suit. General issued the primary policy for $1,000,000, and Employers issued a policy for $5,000,000 for claims that exceeded the primary policy. As a result of General's mishandling of the claim, Employers was damaged by having to settle the case for an unreasonable amount.

### 2. Accident & Litigation.

The claims in the underlying state action arose from an accident in May of 1987. A scaffold used for window-washing fell from the roof of Pennzoil Place in Houston, resulting in the deaths of two window-washers and in injuries to several pedestrians. Jobs, which had the contract with the building's management for window-washing, was just one of several defendants in the many suits that were brought in state court, most of which were consolidated. Other defendants included the building's management, the architects of the building (including the window-washing track system), and the supplier of the scaffolding.

By August of 1990, all personal injury claims by all of the plaintiffs had settled for all defendants except Jobs. An exception to this general settlement were the claims brought by a child of one of the window-washers. There had been no settlement because of questions about the child's paternity.

As the primary insurer, General assumed the defense of Jobs. In the months leading to trial, General, advised by its lawyers, fielded settlement offers from Ronald Krist, the plaintiffs' attorney. At no time did General accept an offer from Krist, nor did it make any counter-offers that exceeded $150,000. Employers, as the excess carrier, could not take control of the defense unless General "tendered" its limits, which would allow Employers discretion to use General's $1,000,000 as it saw fit.

Not only did General decide against settlement, it affirmatively took steps to prevent Employers from participating in or having knowledge of trial preparations or settlement negotiations. As the negotiations and preparation moved without Employers, Employers repeatedly demanded that General tender its policy limits so that Employers could undertake the defense; it was obvious to Employers that the probability of its coverage being required in part was high.

On the eve of trial, April 1991, Employers met with Krist without General's knowledge and agreed to a settlement. Employers informed General of the talks and once more demanded that General tender its limits. This time it did, though "under protest." Jobs settled the claims against it for $3,050,000, requiring Employers to pay $2,050,000.

Employers sued General, trying that case to this court. The propriety and necessity of this settlement and the insurers' conduct before the settlement is disputed.

### 3. Equitable Subrogation.

■ Under Texas law, an excess carrier may bring an action against a primary carrier for mishandling a claim. If the insured, rather than the second-level carrier, had paid the excess, the insured would have an action for mismanagement of the claims adjustment process. Equity requires that the excess insurer be allowed to maintain the action that the insured could have brought itself against the primary carrier for the loss occasioned by the primary carrier's error.

■ The excess carrier's interests are subrogated to the interests of the insured to the extent that the excess carrier bore the loss. Without this remedy, the primary insurer would have no incentive—other than spontaneous integrity—to work to settle within the limits of the primary policy when it is reasonably clear that the primary level will be consumed, as this case illustrates. *See American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480 (Tex.1992).

For example, if an insurer with a policy limit of $1,000,000 believes that there is only a five percent chance that it will win at trial, it might refuse a settlement offer of $950,000 because it would at most be risking $50,000 if a jury found for the plaintiff, even if the verdict was $5,000,000. Because it is the insured's or an excess carrier's money that is at risk above the primary policy's limits, the primary carrier must have a duty to handle the claim with the insured's best interests in mind as well as its own. The least duty would be the level of care one would exercise if the whole liability were for the account of one party.

The consequences of this rule serve the public interest in several ways. First, the claims in lawsuits ought to be settled reasonably. Second, unreasonable behavior by the primary carrier results in economic waste through increased costs for the same protection, unproductively raising premiums for excess insurance. Finally, equitable subrogation distributes losses between the primary and excess segments of the insurance industry according to the additional cost the particular segment causes by its own choice of behavior.

█ Equitable subrogation does not create new duties on the part of the primary carrier. Equitable subrogation is derived solely from the insured's rights against the primary carrier for a wrongful refusal to settle a claim within the policy limits. *Id.* at 482–83. Before it may recover, the excess carrier has to prove that the primary carrier was negligent in fulfilling its duties to the insured under the primary policy's terms.

### 4. Claims Processing.

█ The factual difficulty in this type of case is that the event generating the potential liability is not a restricted objective change in physical realities, like a falling scaffold; negotiations are filled with judgment calls, subjective evaluations, postures, tentative positions, talking points, counterploys, all with little concrete residue. The court must reconstruct and appraise protracted multi-party negotiations that took place several years ago leading to the final settlement. The pivotal factual questions in

that reconstruction are (a) whether General's estimate of Jobs's potential liability was reasonable, (b) whether General did actually rely on advice of counsel in reaching the estimate, or (c) whether General failed to operate in good faith.

### 5. Liability Valuation.

General asserts, both before the underlying trial and today, that it reasonably concluded that Jobs would be found no more than ten percent liable at the trial. General asserts that it based its conclusion on the valuation by its counsel, Mattingly. For the recovery at the trial to implicate the excess carrier at a 10% share of liability, the damage award would have to have been over $10 million. It took the position that Jobs would be liable for far less than the $1,000,000 limit of its primary policy. Mattingly testified to this effect, and Mike Jones, the claims adjuster at General, testified that he relied on Mattingly's estimations.

Both based the conclusion on their appreciation of the advantage to Jobs at trial of having many absent defendants to whom Jobs could point as the true wrongdoers. Further, General considered that its position was strengthened by evidence that, unknown to Jobs, the scaffold's safety mechanism, designed to prevent exactly the kind of accident that occurred, was tied down. General concluded that a jury would be inclined to find that Jobs was not negligent. Finally, Jobs hoped to present itself as an innocent party by distinguishing itself from Rom, Inc., a subsidiary of Jobs and the official corporate entity that was responsible for all of Jobs' high-rise work.

None of General's positions withstood the weight of the evidence at trial. The notoriety of this accident through the extensive publicity it received might alone be sufficient to doubt General's deflated estimates. In addition, juries are known to award large damages in cases with violent events and horrible consequences. The celebrated (or resented) successes of the plaintiffs' attorney, Ronald Krist, whose reputation extends beyond Houston, also indicated the danger of a large verdict. Krist himself took no special

credit for the threat of a huge award, indicating that the nature of the events were sufficient to promise the plaintiffs a significant recovery.

In light of the circumstances as they were known to the parties in the months leading toward the trial, it is unlikely that a jury would free Jobs from liability based either on empty chairs or an absence of negligence.

### 6. *Offset.*

General argues that it built up a large offset to its liability by allowing the other defendants to settle first. The offset would shield Jobs from any verdict against it under the former comparative responsibility statute. *See* Tex.Civ.Prac. & Rem.Code §§ 33.-001–.016 (1986). Whether the new statute applied to these cases, however, was disputed because of the effective date of the new statute and the filing dates of the various lawsuits. When one considers the factual context of the claims against Jobs, General's reliance on contingent, speculative statutory relief was negligent.

### 7. *Corporate Identity.*

Even assuming that no formal attempt to disregard the corporate entities was made, either at trial or in collection, General's claim that Jobs and Rom are distinct entities is untenable. First, Lareau Coleman, who operated and partially owned Jobs, also owned 49% of the stock in Rom. Second, both corporations shared the same private counsel. Third, Employers had photographs of Rom employees wearing t-shirts with the Jobs' logo. Finally, Coleman had created Rom as the nominal corporation in charge of all high-rise activity; no witnesses appeared to dissuade this court that the background information that would be available to a jury would make them unlikely to find liability only for the subsidiary. The use of the corporate entity to shield Jobs from liability is legal, but the jury would consider the context and the separateness of the actual operation. The attempt to separate the operations would fail before a jury and that failure should have been part of General's calculation.

### 8. *Unclean Hands.*

Even if its estimates of liability were thoroughly unsound, General claims that they were the result of reliance on counsel. Reliance on counsel protects an insurer only under conditions of full disclosure to counsel, genuine inquiry, and actual dependence on the lawyer's judgment. Merely running paperwork through a lawyer for summary rejection cannot armor General's position beyond its intrinsic merit.

General's claim of innocence through recourse to counsel founders on the methods it employed. General claims it finally tendered its limit only as the result of Employers' coercive bad faith. The evidence of bad faith, however, implicates General and not Employers. The range of the lawyer's liability estimates may be plausible; the issue, however, is that General cannot establish reliance on those estimates, regardless of their accuracy.

Rather than disclose the particulars of the case candidly and rely on counsel's responsive advice, General instead attempted to manipulate the process. The tainted process precludes reliance in equity. General instructed the lawyer to talk to its case representative, Mike Jones, before preparing an opinion letter or "putting anything down on paper." General conceded this at trial while insisting that those instructions were its normal office procedure. This explanation is cold comfort. It is wholly unpersuasive, especially in light of other evidence of General's lack of candor, including Jones's instructions to Mattingly to remove Employers from the mailing list. General concealed from Jobs and Employers that it had hired an additional attorney, George McCall, midway through the negotiations. General's distortion of the facts and failure to disclose caused none of the damages. This conduct serves to illustrate its bad faith.

There was, on the other hand, no evidence of wrongdoing on the part of Employers that would preclude its equitable recovery. General alleges that because Employers did not tell General of its meeting with Krist on the eve of trial, Employers acted in bad faith and coerced General's huge settlement. Direct,

prompt contact between the lawyers for Employers and the plaintiffs was necessary under the circumstances that resulted from General's non-disclosure. The better practice is for a level of coverage to tell the other levels of the consultation between it and the claimant. Here, the reason that compelled the meeting also suggested the exclusion of the primary carrier.

Having found the Mattingly estimates unrealistically optimistic and having found General's reliance defective, the court finds that it was negligent for General to refuse continually to negotiate rationally within its limits or to admit the likelihood of liability in excess of its estimates.

### 9. Settlement Offers.

Employers had attempted to obtain General's cooperation as early as June of 1987, requesting a $600,000 contribution to a joint settlement effort that could have capped all of the defendants' liability. Jobs and Rom's corporate counsel, however, was at odds with General throughout the litigation. Fry, Jobs' litigation counsel, made repeated requests for General to settle the case, but he met the same resistance Employers encountered. In a letter that indicated Jobs's urgent apprehension, he made his last attempt in April of 1991. General was blind even to signs from the plaintiffs that a full resolution depended on General's tendering of its limits.

As early as December 1989, Krist told General that its cooperation was needed. Then in August of 1990, Mattingly advised General that the plaintiffs had offered to settle all claims by all plaintiffs (except the illegitimate child's) against Jobs for $950,000. Jones's counter-offer of $150,000 enraged Krist, and the plaintiffs' offer went back up to $6,000,000. At the trial in this case, no defense of the $150,000 offer was attempted by General.

Given General's intractability and the threat of a huge jury verdict, Employers' anxiety immediately before trial was thoroughly justified. With no information or co-operation forthcoming from General, Employers had to talk with Krist. Charles Partain, the claims manager for Employers, had adequate knowledge of the facts of the law-suit; he arrived at the meeting anxious, not panicked. It was not the case that Employers allowed itself to be bullied by a forceful plaintiffs' attorney into an unreasonable settlement. It was not the meeting that forced Employers into settlement, but General's mishandling of the claim.

At the time, General only *suspected* that a deal was being made. It had the opportunity to move for a continuance of the trial, and it continued to have plenty of opportunities to confer with the other parties, including the four days that the trial would require. There was ample time for General to apprise itself of the situation; this case was fully prepared and fully investigated by the time Employers demanded a settlement on the eve of trial. General was not forced to settle. In any case, the worst potential effect that Employers' actions had was to leave General's total exposure at $1,000,000 by paying $2,000,000, leaving General's liability to be litigated at trial.

General's gamble with the money of both its insured and Employers would be considered risky by even the risk seekers. The size of the gamble is not just an after-the-fact assessment. General had sufficient facts to calculate the risks and in fact was being continually apprised by other parties about the extent of those risks. It is irrelevant whether it made its calculation using the upper limit of Mattingly's ten percent estimation of liability or Krist's eighty-five percent of a lower figure. A fully-informed, disinterested attorney would find that the likely upper limit of liability exceeded $1,000,000. General's failure to act was negligent, violating its duties to both Jobs and derivatively to Employers.

■ This negligence finding is not based on a finding of negligence in General's investigation, rather, it is based on General's violation of a standard of care. The standard requires a primary insurance carrier to determine a reasonable range of likely outcomes in a pending suit and, if that range exceeds the policy limits of the primary policy, to include the excess carrier in the defense decisions and to offer direct participation in management of the suit. If the

reasonable range of likely outcomes greatly exceeds the primary policy limits, the excess carrier can request that it exercise primary responsibility for the management of the case. As a result of General's failure in these duties to Employers, Employers suffered damages in the amount of $2,050,000, which it is entitled to recover.

### 10. Punitive Damages and Attorney Fees.

Punitive damages and attorney fees may be recoverable in Texas in equitable subrogation suits between insurance carriers. What Texas law is on this question must be inferred from limited sources; these suggest that the excess carrier may recover only the difference between what it was required to pay and what it would have paid but for the primary carrier's negligent handling of the action, plus interest. *Canal*, 843 S.W.2d at 485.

Even if this court were inclined to interpret Texas law to extend the damages available, this case is not an appropriate one to apply the extension. General's conduct was negligent, but it was not egregious enough to justify punitive damages. *See Transportation Ins. Co. v. Moriel*, No. D–1507, 879 S.W.2d 10 (Tex. June 8, 1994). Employers is not entitled to either punitive damages or attorney fees.

### 11. Prejudgment Interest.

The appropriate prejudgment interest rate is 6%. This case involved the question of equitable subrogation, which necessarily involved underlying issues sounding in both tort and contract. The record shows that this case raises issues arising principally from contract rather than tort. Accordingly, the statutory simple interest rate is appropriate. Tex.Civ.Stat. art. 5069–1.03. *See, e.g., Fidelity and Cas. Co. v. Central Bank of Houston*, 672 S.W.2d 641, 649 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

### FINAL JUDGMENT

Employers recovers from General Accident Insurance Company and Potomac Insurance Company of Illinois:

A. Principal of $2,065,000;

B. Prejudgment interest at 6% simple interest from November 13, 1991, through the date of this judgment;

C. Postjudgment interest at 5.31% per annum; and

D. Costs of court.